# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

TABER LEBLANC, )
 )
      Plaintiff, )
vs. ) NO. CIV-10-00503-HE
 )
THE TRAVELERS HOME AND )
MARINE INSURANCE COMPANY, )
 )
      Defendant. )

## ORDER

This case involves a dispute over the amount due to plaintiff Taber LeBlanc under a homeowner's insurance policy issued by defendant The Travelers Home and Marine Insurance Company ("Travelers"). Defendant issued a "High Value Homeowners Policy" to plaintiff which was in force at the time of a February 10, 2009, tornado which passed through plaintiff's neighborhood in Edmond, Oklahoma. The tornado caused substantial damage to plaintiff's house and Travelers made certain payments to plaintiff under the policy, but a dispute eventually arose as to the scope and amount of the loss attributable to the tornado. In July 2009, Travelers invoked the appraisal clause under the policy as to certain matters in dispute.[1] The appraisal process resulted in an umpire being designated,

---

[1]*The appraisal provision in the policy, Special Provisions - Oklahoma [Doc. #8-1], provides: "**7. Appraisal**. If you and we fail to agree as to the actual cash value or the amount of loss, either party may make written demand for an appraisal of the loss. In this event, only the party which demanded the appraisal will be bound by the results of that appraisal. Each party will choose a competent and disinterested appraiser within 20 days after the written demand had been made. The two appraisers will choose a competent and disinterested umpire. If they cannot agree upon an umpire within 15 days, then, at the request of either you or us, after notice of hearing to the nonrequesting party by certified mail, the umpire shall be selected by a judge of a district court in the county where the loss occurred. The appraisers will separately state the actual cash value and loss to each item. If the appraisers submit a written report of agreement to us, the amount agreed*

who ultimately concluded the applicable loss to be $1,614,052.[2]

The appraisal process did not resolve the parties' differences, which ultimately included further disputes as to the scope, nature and result of the appraisal process. Plaintiff thereafter filed this case, which asserts claims for breach of the insurance contract and for breach of the duty of good faith and fair dealing. Defendant filed its answer and counterclaim, Doc. #8, which, among other things, asserts a counterclaim for declaratory relief. The counterclaim seeks a declaration that the umpire's decision inappropriately decided issues of coverage and causation, that it exceeded the scope of the matters in dispute as to the appraisal process, and that the defendant is therefore not bound by the ruling. It also seeks a declaration that there is no coverage under the policy for the basement trusses.

In the pending motions, both parties have moved for judgment on the pleadings.[3] Plaintiff argues that defendant lacks standing to challenge the appraisal and that, in any event, it has not alleged any recognized basis for doing so. In its cross-motion, defendant argues the pleadings make clear that the umpire exceeded his authority in various ways and

---

*upon will be the amount of loss and will be binding on the party which demanded the appraisal. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of actual cash value and loss and will be binding on that party which demanded the appraisal. Each party will . . . [p]ay its own appraiser; and . . . [b]ear the expenses of the appraisal and umpire equally."*

[2]*Under the policy, each side designated an appraiser and, as the appraisers were unable to agree on the various items, an umpire was selected. The umpire's ruling, Doc. #8-5, thus represented the result of the appraisal process.*

[3]*The pleadings have attached, and the court has considered, the following exhibits: Ex. 1 (Policy); Ex. 2 (Letter dated 6/15/09); Ex. 3 (Letter dated 7/23/09); Ex. 4 (Letter dated 2/12/10); Ex. 5 (Umpire ruling); Ex. 6 (Memo dated 4/9/10). See Doc. #8, Ex. 1-6.*

it should not be bound by the determination. The court heard oral argument on the motions on March 10, 2011.

Motions for judgment on the pleadings are subject to the same standards as govern motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Park University Enterprises, Inc. v. American Casualty Co. of Reading, PA, 442 F.3d 1239, 1244 (10th Cir. 2005). When considering whether a plaintiff's claims should be dismissed under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the nonmoving party. Anderson v. Suiters, 499 F.3d 1228, 1232 (10th Cir. 2007). "[I]n deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may look both to the complaint itself and to any documents attached as exhibits to the complaint." Oxendine v. Kaplan, 241 F.3d 1272, 1275 (10th Cir. 2001); *see* Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). A claim will be dismissed if the complaint fails to state "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A plaintiff must "frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting Twombly, 550 U.S. at 556). "Judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park University, 442 F.3d at 1244 (internal quotation and citation omitted).

These motions present a number of difficult questions, both substantively and

procedurally. A threshold matter worth noting is that, in these motions, both parties address issues that may be only contingent and not determinative of the issues in the case. The focus of the motions is the validity and enforceability of the umpire's award. Yet the complaint in this case makes no mention of the umpire's award or of the appraisal process. Plaintiff has not, at least in any explicit way, asked this court to enforce the umpire's award. The complaint asserts, in general terms, a claim for breach of the insurance contract which plaintiff may view as embracing enforcement of the award, but the umpire's ruling notes that plaintiff sought several hundred thousand dollars in excess of that ultimately awarded by the umpire. If plaintiff intends to assert contract damages in excess of the amount of the umpire's ruling, then concerns with the umpire's award would appear to be beside the point.[4] However, on the assumption that the validity and enforceability of the award may ultimately be pertinent, and as both parties have given considerable attention to the question, the court concludes it is appropriate to address the motions.

Plaintiff seeks judgment on two broad grounds. First, he argues that Travelers lacks standing to object to the umpire's award as it was the party which invoked the appraisal process. Second, he argues that, in any event, Travelers has not alleged any recognized ground for setting aside the appraisal.

The first argument is easily disposed of. Plaintiff suggests that <u>Massey v. Farmers Ins.</u>

---

[4]*It is true that, under Oklahoma law, an appraisal determination in this context is ordinarily binding on the party invoking the appraisal process. <u>Massey v. Farmers Ins. Group</u>, 837 P.2d 880, 884 (Okla. 1992). However, that rule would presumably not extend to permitting the non-invoking party to hold the invoking party to the appraisal while itself still pursuing greater amounts (i.e. using the appraisal only as a floor for damages).*

4

Group, 837 P.2d 880, "fairly implied" that only the non-invoking party could object to an appraisers award if that party can establish one of the recognized grounds for setting aside an award, which Massey describes as fraud, bad faith, or mistake. Id. at 884. The court finds nothing in Massey that implies such a result. Indeed, that reading of Massey makes very little sense. Massey makes clear that an appraisal provision in an insurance policy like that involved here is binding on the party who invokes the process.[5] The non-invoking party is not bound at all. *See* Trinity Baptist Church v. GuideOne Elite Ins. Co., No. CIV-06-1201, 2009 WL 2972502, at *3 n. 5 (W.D. Okla., Sept. 14, 2009) ("The holding of *Massey* is that an appraisal award obtained under an appraisal provision . . . is not binding on a party who did not initiate the appraisal process."). If the non-invoking party is not bound at all, why would it ever bother to undertake the task of proving the award was the result of fraud, mistake or some other factor? It would simply ignore the award. The only reading of Massey that makes sense is that the party which invokes the process can avoid the result if it proves fraud or some other recognized basis for challenging the award. That said, it is true that Travelers has not alleged fraud, bad faith or mistake as a basis for avoiding the award.[6] It has, however, challenged the award on the basis that the umpire addressed issues

---

[5]*Massey, the most recent Oklahoma Supreme Court decision addressing issues as to the appraisal process, involved a policy provision conforming to the statutory requirements for a standard fire insurance policy in Oklahoma. The policy in this case is a homeowner's policy and involves policy language which is, in substance, the same as that in Massey. No party has suggested that some different standard would apply here due to the type of policy and the court has assumed the standards of Massey apply equally to the homeowner's policy here at issue.*

[6]*The legal parameters of "mistake" in this context have not been addressed by the parties, but it is at least clear Travelers has not alleged mistake in any explicit sense.*

5

beyond those as to which the appraisal process was invoked and that he determined issues of coverage and causation. Where a dispute exists as to the permissible scope of the appraisal process, or as to whether a particular result is outside what the parties' agreement contemplated, a question for court resolution is presented. *See* Sooner Builders & Investments, Inc. v. Nolan Hatcher Const. Services, L.L.C., 164 P.3d 1063, 1071 (Okla. 2007) (noting, in the arbitration context, that when a "arbitrator's award manifests an infidelity to the parties' agreement, the court must refuse to enforce the award."); *see also* 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance, § 213:40 (3d ed. 2005) ("An arbitrator or appraiser has no more authority than is set forth in the policy and the agreement of submission. Consequently, an award which does not comply with the appraisal agreement may be set aside."). Here, the pleadings make clear that a dispute exists both as to the scope of the appraisal process (i.e. the subject matter) and as to the scope of the umpire's ruling. Plaintiff's motion must therefore be denied. The nature of the dispute is described more fully below in connection with the related issues involved with defendant's cross-motion.

As noted above, defendant's cross-motion seeks entry of judgment as to some of the issues raised by its request for declaratory relief. It argues that judgment on the pleadings is appropriate, determining that the umpire lacked the authority to make determinations of coverage and/or causation. It also argues that, to the extent the umpire exceeded his authority either by the scope of his determinations or by considering items other than those for which the appraisal process was invoked, it is not bound by the umpire's ruling.

The dispute as to the scope of the appraisal process arises principally out of a

6

disagreement as to whether plaintiff was entitled to be paid for damage done to the support trusses of the house. Traveler's counterclaim alleges that it had inspected the property, made determinations as to the extent of the covered loss, and made payments to plaintiff for that loss. It alleges that "included within those payments, was a resolution of issues concerning the basement trusses of the LeBlanc home." Counterclaim [Doc. #8, ¶ 6]. It further alleges that, once the appraiser for plaintiff later began asserting items of alleged damage involving the support trusses, it objected to the inclusion of those items in the matters to be determined. Id. ¶¶ 10-11. Plaintiff denies these allegations. However, for present purposes, the pleadings frame a disputed issue as to the subject matter intended to be included in the agreement to submit disputes to the appraisal process.[7] This precludes both entry of judgment for plaintiff on the pleadings, as noted above, and entry of judgment for defendant to the extent it seeks it based on a theory that the appraisal process extended to a subject matter beyond that identified in the parties' submission.[8]

---

[7]*The "submission agreement" in this case (i.e. the parties' identification of those issues to be addressed by the appraisal process) is subject to other uncertainties beyond an asserted prior agreement as to the trusses. Traveler's invocation of the process, effected by a 7/23/09 letter from Scott Dau, demanded appraisal on "the disputed items on the structural portion of this claim." [Doc. #8-3]. There appears to be a dispute as to what was meant by the "structural" portion but, regardless of that, the documents are not clear as to what was meant by "disputed items." The Dau letter was apparently in response to either a 6/15/09 letter from plaintiff's counsel to Dau [Doc. #8-2] or a complaint plaintiff filed with the state insurance commissioner (not part of the pleadings), or both. Counsel's letter makes no explicit reference to support trusses, but does indicate the items listed in it were not a comprehensive list.*

[8]*Both parties appear to assume that the appraisal process can be invoked for certain identified items without necessarily invoking it for all disputed matters involved with a particular claim. This appears to be consistent with the policy language, which contemplates particular <u>items</u> being considered and determined by the appraisers.*

7

The harder question, and the one to which the parties devote most of their attention, involves the question of whether the umpire exceeded the scope of his authority as an umpire. Travelers argues that the pleadings show the umpire to have made determinations of both coverage and causation and that, under Oklahoma law, he may not do so. It argues that the umpire is limited simply to determining the amount of loss, relying on the language of the policy (appraisal may be invoked to address "actual cash value or the amount of loss") and the Oklahoma Supreme Court's decision in <u>Massey</u>. Plaintiff concedes that some of the language employed by the umpire suggests he made coverage decisions, but that he did not in fact do so and that his "causation" decisions were an unavoidable part of the process of determining the "amount of loss" covered by the policy. He argues that <u>Massey</u> does not control the result here and relies on authorities from other states concluding that in certain circumstances an umpire may make what are, at least in part, causation determinations.[9]

As noted above, the <u>Massey</u> case is a decision by the Oklahoma Supreme Court which addressed various issues as to the appraisal process and which appears to come closest (of the available Oklahoma authorities) to addressing the issues involved in this case. <u>Massey</u> involved a claim for loss under a standard fire insurance policy. After the plaintiffs' home was damaged by fire, the Masseys and their insurer could not agree on the amount of loss and plaintiffs filed suit. Thereafter, the insurer invoked the policy's appraisal mechanism to

---

[9]*See, e.g.*, <u>Johnson v. Nationwide Mut. Ins. Co.</u>, 828 So.2d 1021 (Fla. 2002); <u>Kendall Lakes Town Homes Developers, Inc. v. Agricultural Excess and Surplus Lines Ins. Co.</u>, 916 So.2d 12 (Fl. Ct. App. 2005); <u>Quade v. Secura Ins.</u>, 792 N.W.2d 478 (Minn. App. 2011); <u>Johnson v. State Farm Lloyds</u>, 204 S.W.3d 897 (Tex. App. Div. 2006).

8

determine the amount of loss and both sides appointed appraisers who "figured the estimate for repair." 837 P.2d at 881. The court appointed an umpire suggested by the insurer, and he made a determination of the cost to repair the house ($49,146). Plaintiffs objected to the amount, fired their lawyer, and ultimately dismissed their state court lawsuit prior to any formal acceptance of the umpire's determination by the court. They later got a new lawyer and filed suit in federal court, re-asserted their contract claim and added a claim for bad faith breach. They were a bit more successful in federal court, with the jury ultimately returning a verdict in excess of $4,000,000 in actual, consequential and punitive damages. The insurer lacked enthusiasm for that result and, on appeal to the Tenth Circuit Court of Appeals, argued plaintiffs should be bound by the state court umpire's damage appraisal. The Court of Appeals then tendered a certified question of law to the Oklahoma Supreme Court, seeking guidance on the preclusive effect, if any, of the umpire's determination. The Oklahoma court ultimately concluded that the umpire's decision did not have preclusive effect as to plaintiffs, because they were not the party which invoked the process. Stated affirmatively, <u>Massey</u> establishes that the party invoking the appraisal process in the context of a standard fire policy is ordinarily bound by the result of the process.[10]

<u>Massey</u>, however, did not turn on the issues raised in this case. There appears to have been no issue of "coverage" in that case, as there was no dispute that the policy covered fire losses. Similarly, there appears to have been no issue as to whether the Massey's losses were

---

[10]As noted above, the court suggested an award could be challenged based on fraud, bad faith, or mistake. *Massey, 837 P.2d at 884 n. 2.*

9

caused by fire versus some other cause. The sole question was the extent of those losses, i.e. what it would take to repair the house. Here, defendant argues there are both coverage and causation issues and that the umpire exceeded his authority by addressing them.

Read literally, the umpire's decision in this case [Doc. #8-5] indicates he made both coverage and causation decisions. He characterized his task this way: "The primary issues addressed by the umpire include the cause of the damage, the extent of the damage, the appropriate coverage, and the monetary value to make the insurance holder whole in light of these findings." After noting the dispute as to the trusses, including whether there was proof of some pre-tornado defect or condition, he concluded, "Cause and coverage are therefore confirmed by the Umpire to be under the terms of the policy." He then turned to the determination of the amount needed to restore the home to its assumed condition prior to the tornado,[11] concluding the amount was $1,614,052.

Notwithstanding the language used by the umpire, the court concludes he did not really make a "coverage" decision in the sense that term is used in this context. There was no dispute here that tornado damage was a covered peril under the homeowner's policy. Similarly, at least so far as appears from the present submissions, there was no dispute that damage due to certain pre-existing or other conditions would be excluded from losses

---

[11]*The umpire assumed, for purposes of his calculations, that there was not a pre-existing problem with the trusses. He apparently reached this conclusion based on the absence of specific evidence to the contrary and on a sort of policy judgment that, as the insurer had the ability to inspect the house as part of the underwriting process but apparently did not, it should be responsible for the whole loss.*

payable under the policy.[12] The real question, which the umpire clearly did address, is what caused the particular damages at issue. Was the damage to the support trusses and other disputed damage to the house due to the tornado, a peril covered by the policy, or to some other excluded cause?

It has long been the prevailing view that the appraisal process, invoked under a policy such as that involved here, is directed to the question of the amount of loss rather than issues of coverage or causation. The court in Massey characterized (with approval) the majority view as follows:

> This holding finds support in the majority view concerning appraisal provisions, including the generally recognized rule that appraisal provisions permit appraisers or umpires *to determine one issue, to wit, the amount of damage to the property*.
>
> The majority view also concludes that although appraisal awards generally cannot determine the *cause* of a loss and *do not discharge* a cause of action on the policy, they are conclusive as to the amount of damages, and a *confirmed award* has the same preclusive effect as a judgment in a civil action.

837 P.2d at 882-83 (internal citations omitted) (emphasis added and emphasis in original). A leading treatise states the principle this way:

> As a general rule, the sole purpose of an appraisal is to determine the amount of damage. As a consequence, an appraisal clause does not permit appraisers to determine whether a loss was, in fact, total. However, the replacement cost of real property may be appraised, that is, estimated or evaluated.

---

[12]*Defendant relies on what appear to be three exclusions, involving "collapse or danger of collapse," "latent defect . . . or any quality in the property that causes it to damage or destroy itself," and settling, shrinking, bulging or expansion of foundations, walls, or similar structural components.*

11

. . .

>Under a typical appraisal clause, the only issue to be determined by the appraiser is the amount of the loss. Consequently, questions concerning policy defenses or coverages are not to be addressed by the appraisers.

15 Russ & Segalla, Couch on Insurance, §§ 210:42 & 212:3 (sections cited respectively).

The problem, of course, is that drawing lines between "coverage," "causation" and "amount of loss" is not always clear cut in actual practice. The problem is particularly difficult where, as here, the real dispute is causation.[13] Plaintiff argues that where there is undisputed evidence of damage due to a covered peril, the determination of the *extent* of that damage is within the scope of the appraisal process and is loss or damage the umpire can determine. There is authority to support that view.[14] However, the controlling law in this case is that of Oklahoma. And in the absence of any Oklahoma authority specifically addressing the issues at hand, the court "must attempt to predict what the state's highest court would do." Wade v. EMCASCO Ins. Co., 483 F.3d 657, 665 (10th Cir. 2007) (internal quotations and citation omitted). Here, Massey strongly suggests that Oklahoma would view the umpire's role narrowly, as indicated by its reference to the "generally recognized rule that appraisal provisions permit appraisers or umpires to determine one issue . . . the amount of

---

[13]*See generally, State Farm Lloyds v. Johnson, 290 S.W.3d 886 (Tex. 2009), which describes some of the history of appraisal clauses and the difficulties of defining the proper role of the appraiser/umpire in practice.*

[14]*See the authorities cited above, n. 9.*

damage to the property." 837 P.3d at 882.[15]

Here, the umpire's ruling plainly went beyond determining the amount of the damage to the property. It also made the determination that all of the loss was attributable to the tornado, a conclusion that was and is disputed. The court concludes the umpire's determination of causation was akin to what might be decided by an arbitrator in a proper case, but that it went beyond what Oklahoma allows to be determined by an appraiser. While the umpire's determination of the amount necessary to restore the house to its condition at an earlier time is of the sort that appraisers/umpires may properly make, his conclusions as to what caused the damage to the house, or in what proportions, are not.

In light of the foregoing, plaintiff's motion for judgment on the pleadings [Doc. #39] is **DENIED**. Defendant's motion for judgment on the pleadings [Doc. #57] is **GRANTED** to this extent: if plaintiff ultimately seeks to rely on the appraisal process and the umpire's award as the basis for a contract recovery in this case, he may do so only as it establishes the amount of $1,614,052 as the cost to repair the house to its pre-tornado state. Should plaintiff seek to rely on the umpire's award for that purpose, defendant will be bound by that number unless it can establish, as a matter of affirmative defense, that the issue of damage to the trusses (or other disputed damage) was outside the scope of the referral to appraisal. The issue of causation—whether the damages ultimately established were due to the tornado or

---

[15]Though factually distinguishable from this case, Trinity Baptist Church, referenced above, is consistent with the view that the umpire's role is indeed a narrow one. 2009 WL 2972502, at *3 (noting that "appraisal awards generally cannot determine the cause of a loss and do not discharge a cause of action on the policy" (internal quotations and citation omitted)).

to some other arguably excluded condition or reason—remains for resolution by the court in ordinary course.

**IT IS SO ORDERED**.

Dated this 23rd day of March, 2011.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE